1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT
7                       FOR THE DISTRICT OF ARIZONA
8
   Robert Gonzalez,                    )
9                                       )    No. CV-08-658-TUC-FRZ-DTF
                   Petitioner,          )
10                                      )    **REPORT & RECOMMENDATION**
   vs.                                  )
11                                      )
   Charles Ryan, et al.,                )
12                                      )
                   Respondents.         )
13                                      )
   _____    )
14
15        Petitioner Robert Gonzales has filed a Petition for Writ of Habeas Corpus pursuant

16   to 28 U.S.C. § 2254. Pursuant to the Rules of Practice of the Court, this matter was referred

17   to Magistrate Judge Ferraro for Report and Recommendation. Before the Court are the

18   Petition (Doc. 1), Respondents' Answer (Doc. 18), and Petitioner's Reply (Doc. 21). The

19   Magistrate Judge recommends the District Court, after its independent review of the record,

20   dismiss the petition.

21                    **FACTUAL AND PROCEDURAL BACKGROUND**

22        Gonzalez was convicted in two separate jury trials, for shooting at Mark Humo and

23   Officer Lewis, in incidents that occurred two weeks apart. The following factual summary

24   of the crimes is taken from the Arizona Court of Appeals' opinion, construing all facts in

25   favor of the prosecution:

26        On the evening of November 3, 2001, the victim, M[ark Humo] was outside
          of the apartment he shared with his girlfriend, A[lyssa Preciado], and
27        A[lyssa's] three children, one of whom was fathered by Gonzalez. Carrying
          a firearm, Gonzalez approached M[ark] and asked about his daughter. The
28        two men began to argue and A[lyssa] came outside to help defuse the situation.
          After a contentious exchange, Gonzalez shot M[ark] four times. Although
          M[ark] was seriously injured, the injuries were not fatal. Gonzalez then fled.

About two weeks later on November 19, 2001, police attempted to serve Gonzalez with an arrest warrant in connection with the November 3 incident. For the arrest, they initiated a "dynamic takedown," meaning that they would have their weapons drawn. The officers waited in a strategic location, and when the supervising officer spotted Gonzalez, he announced "Tucson Police" and ordered Gonzalez to get on the ground. Gonzalez drew a handgun and fired four shots at one of the other officers, L[ewis], who was not seriously injured. The supervising officer then fired and hit Gonzalez, which subdued him and allowed the officers to arrest him.

(Doc. 18, Ex. D at 2-3.)

As to the first event, Gonzalez was convicted of attempted first degree murder, three counts of aggravated assault and two counts of endangerment. He was convicted of attempted first degree murder, aggravated assault and disorderly conduct as to the second shooting. (*Id.* at 3.) The longest sentences imposed were two, consecutive eighteen-year terms for the attempted murders. (*Id.* at 2.)

Gonzalez filed a direct appeal challenging his convictions and sentences arising from both trials. (Doc. 18, Ex. B.) The Arizona Court of Appeals affirmed his convictions and sentences. (*Id.*, Ex. D.) Gonzalez sought review at the Arizona Supreme Court, which was summarily denied on October 26, 2004. (*Id.*, Exs. E, F.) Petitioner filed a pro se petition for post-conviction relief (PCR), which he supplemented twice. (*Id.*, Exs. G, H, I.) The PCR court denied relief. (*Id.*, Ex. J.) Petitioner appealed the decision, and the appellate court adopted the decision of the PCR court and affirmed. (*Id.*, Ex. K.) The Arizona Supreme Court denied review on December 17, 2007. (*Id.*, Ex. L.)

## DISCUSSION

Respondents concede that Gonzalez's December 12, 2008 petition, which initiated this federal habeas action, was within the statute of limitations. (Doc. 18 at 10.) The Court first addresses Respondents' arguments that Claims 2, 3, 6 (in part), 7, 8/13,[1] 9, 14, 15 (in part),

---

[1] Claim 8 challenges the reasonable doubt instruction given at Gonzalez's first trial. Claim 13 alleges the identical instruction given in Gonzalez's second trial. The parties address the claims simultaneously in their briefing. (Doc. 1 at 67; Doc. 18 at 26; Doc. 21 at 47.)

16 (in part), and 17 (in part) are procedurally defaulted and then turns to the merits of the remaining claims.

## EXHAUSTION AND PROCEDURAL DEFAULT

Respondents contend Gonzalez never presented the factual or legal basis for Claims 7 and 8/13, and parts of Claims 6, 15, 16 and 17 in state court. Respondents contend Gonzalez failed to fairly present in state court Claims 2, 3 and 9 as ones based on federal law. Thus, Respondents argue all of these claims are defaulted because Gonzalez would now be barred from raising these claims in state court. As to Claim 14, Respondents argue that the state court found it waived on appeal and precluded, therefore, it is procedurally defaulted.

### <u>Principles of Exhaustion and Procedural Default</u>

A writ of habeas corpus may not be granted unless it appears that a petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To exhaust state remedies, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). If a habeas claim includes new factual allegations not presented to the state court, it may be considered unexhausted if the new facts "fundamentally alter" the legal claim presented and considered in state court. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

Exhaustion requires that a petitioner clearly alert the state court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004); *see also Gray v. Netherland*, 518 U.S. 152, 163 (1996) (general appeal to due process not sufficient to present substance of federal claim); *Lyons v. Crawford*, 232 F.3d 666, 669-70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (general reference to insufficiency of evidence, right to be tried by impartial jury, and ineffective assistance of counsel lacked specificity and explicitness required); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("The mere similarity between a claim of state and federal error is insufficient to establish

exhaustion."). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or case law, *Lyons*, 232 F.3d at 670, or by citing state cases that plainly analyze the federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc); *cf. Fields v. Waddington*, 401 F.3d 1018, 1022 (9th Cir. 2005) (mere citation to a state case that conducts both a state and federal law analysis does not, by itself, satisfy exhaustion).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray*, 518 U.S. at 161-62.

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*,

468 U.S. 1, 9 (1984). However, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

**Fair Presentation**

<u>Claims 7 and 8/13, and 6, 15, 16 and 17 (in part)</u>

Respondents contend Gonzalez did not present the factual basis for Claims 7 and 8/13, and Claims 6, 15, 16 and 17 (in part).

Petitioner did not raise Claim 7, alleging prosecutorial misconduct during Trial I, on direct appeal or in his PCR petition. (Doc. 18, Exs. B, G.) He does not dispute this in his reply brief. (Doc. 21 at 42-43.) Petitioner concedes that Claims 8/13, which alleges that the reasonable doubt jury instructions at his first and second trials relieved the state of its burden of proof, were not raised in state court. (Doc. 21 at 47.) Thus, Claims 7 and 8/13 were not fairly presented.

In Claim 6, Gonzalez alleges the trial court denied him a fair trial by precluding three witnesses, Gabriel Villa Escusa, Myrna Canez and Joe Duran. Respondents argue that the allegations as to Escusa and Canez were not fairly presented. In his reply brief in this Court, Gonzalez acknowledged Respondents' argument on exhaustion but did not respond to it. (Doc. 21 at 39-42.) A review of Gonzalez's appellate brief reveals that he did not contest the exclusion of Escusa or Canez on appeal (Doc. 18, Ex. B at 22-25), thus, these portions of Claim 6 were not fairly presented.

Claim 15 alleges nine instances of prosecutorial misconduct during the closing argument of Trial II: (a) emphasizing that premeditation can be any length of time; (b) stating that purchasing a gun is a substantial step toward committing first degree murder; (c) vouching for Officers Lewis and Blue; (d) arguing that Gonzalez had been dishonest and had a motive to lie; (e) referencing Gonzalez's prior conviction, which was not yet final;

(f) asking the jury not to let Gonzalez "get away with it"; (g) arguing that Gonzalez resisted arrest because he knew he would be imprisoned for a very long time if arrested for his prior crime; (h) arguing that defense counsel did not know what Gonzalez was going to say on the stand and "concocted a story at the last second"; and (i) arguing that Officer Blue needed to move the police car after the shooting due to criminal activity in the area connected to Gonzalez. Respondents argue that only subclaims (e), (h) and (i) were presented on direct appeal. Gonzalez did not argue to the contrary (Doc. 21 at 62), and his appellate brief reveals that subclaims (a) to (d), (f) and (g) were not fairly presented on appeal (Doc. 18, Ex. B at 35-43). Gonzalez's assertion of prosecutorial misconduct on other grounds were not sufficient to exhaust all of the subclaims. *See Kelly v. Small*, 315 F.3d 1063, 1069 (9th Cir. 2003) (satisfying the requirement that "a federal habeas petitioner [must] provide the state courts with a 'fair opportunity' to apply controlling legal precedent to the facts bearing upon his constitutional claim," requires presenting the state courts with the operative facts) (quoting *Harless*, 459 U.S. at 6), *overruled on other grounds by Robbins v. Carey*, 481 F.3d 1143 (9th Cir. 2007).

Respondents allege that twelve of Petitioner's fifteen allegations of ineffective assistance of counsel (IAC) were not fairly presented in state court. In Claim 16(A), Gonzales alleges he was denied effective assistance at Trial I because counsel failed to: (1) object to a preliminary jury instruction that misstated the presumption of innocence; (2) object sufficiently to evidence that Gonzalez was a gang member; (3) object to Detective Mark Cassel testifying as a ballistics expert; (4) object to testimony about a mug shot taken prior to either of the shootings at issue in the trial or challenge the reliability of that identification; (5) challenge the endangerment charge; (6) produce witness Gabriel Villa Escusa to impeach State witness Alyssa Preciado; (7) obtain a ballistics expert to counter (a) Detective Cassel's testimony, and (b) the endangerment counts; and (8) challenge the State's closing argument stating that the victim had four bullet wounds when he only had two. In Claim 16(B), Gonzales alleges he was denied effective assistance at Trial II because

counsel failed to: (1) object to Officer Blue's testimony that Gonzalez heard and acknowledged the officer's identification and warning; (2) object to evidence on whether it is a violation of police procedure for an officer to not announce his presence; (3) object to the prosecutor asking how many times Gonzalez carried a weapon; (4) object to the prosecutor asking why Gonzalez did not contact the police if he knew there was a warrant for his arrest; (5) object to the prosecutor asking if Gonzalez turned himself in; (6) object to Detective Danny Donogean calling the incident an aggravated assault and referring to the victims; and (7) submit a limiting instruction on the use of the prior conviction.

Respondent contends the following IAC claims from Trial I were not raised in the PCR petition, (1), (2), (3), (5), (6) and (7)(b), and that none of the claims from Trial II were raised. Gonzalez does not dispute this argument (Doc. 21 at 71-72) and a review of his PCR petition reveals that these claims were not fairly presented (Doc. 18, Exs. G, H). *See Kelly*, 315 F.3d at 1069 (requiring fair presentation of the operative facts); *Carriger v. Lewis*, 971 F.2d 329, 333-34 (9th Cir. 1992) (treating distinct failures by trial counsel as separate claims for exhaustion and procedural default); *Matias v. Oshiro*, 683 F.2d 318, 319-20 & n.1 (9th Cir. 1982) (finding no fair presentation of eight grounds of IAC not raised in state court); *cf. Strickland v. Washington*, 466 U.S. 668, 690 (1984) (requiring identification of the specific "acts or omissions" of counsel and a determination of whether those acts are outside the range of competent assistance).

Respondents contend that Gonzalez failed to fairly present two parts of Claim 17: the State failed to give notice of the aggravating factors for sentencing (subpart (B)(2)) and his counsel was ineffective at sentencing (subpart (C)). Gonzalez does not dispute this assertion and a review of his appellate brief and the PCR petition (Doc. 18, Exs. B, G) establish that he did not fairly present those portions of Claim 17.

The Court finds that Gonzalez failed to fairly present in state court Claims 6 (as to Escusa and Canez), 7, 8/13, 15 (a) to (d), (f) and (g), 16(A) (1), (2), (3), (5), (6) and (7)(b), 16(B), 17(B)(2), and 17(C).

<u>Claims 2, 3, 9 and 11 as Based on Federal Law</u>

2        Respondents contend that, although Gonzalez raised the factual basis of Claims 2, 3

3 and 9 in state court, he did not allege that these claims were based on federal law. With

4 respect to Claim 2, on direct appeal, Gonzalez argued only that denial of a *Willits* instruction

5 deprived him of a fair trial. (Doc. 18, Ex. B at 14-16.) Gonzalez contends the claim was

6 fairly presented because "the factual scenario suggesting bad faith, loss of exculpatory

7 evidence and favorable inferences from the loss of the evidence, all make it clear that

8 Petitioner was alleging violations of his Sixth and Fourteenth Amendment rights, depriving

9 him of a fair trial." (Doc. 21 at 25.) However, "[i]f a habeas petitioner wishes to claim that

10 an evidentiary ruling at a state court trial denied him the due process of law guaranteed by

11 the Fourteenth Amendment, he must say so, not only in federal court, but in state court."

12 *Duncan v. Henry*, 513 U.S. 364, 366 (1995). A general assertion accompanied by factual

13 inferences that a defendant was deprived of a fair trial does not fairly present a federal

14 constitutional claim. *See Casey v. Moore*, 386 F.3d at 913; *Johnson v. Zenon*, 88 F.3d 828,

15 830 (9th Cir. 1996).

16        On direct appeal, Gonzalez alleged the factual basis of Claim 3 – that he was

17 prejudiced by admission of evidence of his gang affiliation. (Doc. 18, Ex. B at 17-19.)

18 Again, he did not cite a federal basis for this claim, he argued only that admission of this

19 evidence denied him a fair trial. This is insufficient for fair presentation. *See Casey v.

20 Moore*, 386 F.3d at 913; *Johnson v. Zenon*, 88 F.3d at 830. Gonzalez argues that his reliance

21 on Arizona Rule of Evidence 404(a) was sufficient for fair presentation because it prohibits

22 the same evidence as Federal Rule of Evidence 404(a). The Federal Rules of Evidence have

23 no applicability in state court and, therefore, provide no basis for relief for a state criminal

24 defendant. Further, the rules of evidence are not synonymous with a federal constitution

25 right. More importantly, the Supreme Court has explicitly rejected the argument that

26 similarity between the state claim alleged in state court and an unasserted federal claim

27 satisfies the exhaustion requirement. *Duncan v. Henry*, 513 U.S. 364, 366 (1995).

28

In state court, Petitioner alleged the factual basis of Claim 9, that the trial court should not have admitted Gonzalez's prior conviction as impeachment. (Doc. 18, Ex. B at 30-35.) However, he argued only that admission of that evidence was an abuse of discretion and violated the state evidentiary rules. (*Id.*) Gonzalez does not contend he presented a federal claim to the Arizona Court of Appeals, but he argues that Claim 9 is exhausted because he raised the federal constitutional basis of this claim in his Petition for Review to the Arizona Supreme Court. While his assertion is accurate (Doc. 18, Ex. E at 10), exhaustion requires properly raising and fairly presenting a claim at every appropriate state court level. *See Casey v. Moore*, 386 F.3d at 915-16, 918 (raising a claim for the first time to the highest court on discretionary review does not satisfy the fair presentation requirement). In Arizona, a petition for review to the supreme court is a vehicle only to raise issues previously presented to the court of appeals. Ariz. R. Crim. P. 31.19(c). Therefore, raising claims for the first time to the appellate court was insufficient to fairly present any claims to the Arizona state courts.

In Claim 11, Gonzalez argues the trial court violated his right to due process by denying a duress instruction. Respondents indicated that Gonzalez fairly presented this claim in state court as one based on federal law. The Court finds this conclusion to be erroneous.[2] In his PCR petition, Gonzalez questioned whether the trial court was "at fault" for not allowing a duress instruction, and he argued that he was entitled to a duress instruction under

---

[2] In this Court, Respondents argued that the state court found this claim precluded because it was, or could have been, raised on direct appeal. (Doc. 18 at 30.) Again, the Court finds this assessment erroneous because the PCR court did not address this claim at all. (Doc. 18, Ex. J.) However, because Respondents asserted procedural default with respect to this claim, although on a different ground, and Petitioner had an opportunity to respond to that argument and assert cause and prejudice and miscarriage of justice, the Court finds it proper to address a different basis for procedural default. *See Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003) (finding district court can raise procedural default sua sponte under appropriate circumstances); *cf. Day v. McDonough*, 547 U.S. 198, 209 (2006) (holding that district courts may sua sponte consider the timeliness of a habeas petition, just as circuit courts have held can be done for other affirmative defenses such as procedural default).

Arizona law.  (Doc. 18, Ex. G at 5, 75.)  Although Gonzalez cited two federal court cases, they did not analyze a federal constitutional issue.  Rather, both *United States v. Johnson*, 956 F.2d 894, 897-905 (9th Cir. 1992), *superseded in part by* U.S. Sentencing Guidelines Manual § 3E1.1(b) (1992), and *United States v. LaFleur*, 971 F.2d 200, 204-06 (9th Cir. 1991), were direct review cases assessing duress as a defense under federal criminal law.  Citation to these federal cases, which did not analyze the due process claim Gonzalez now raises, was insufficient to fairly present this claim to the state court.  *See Castillo v. McFadden*, 399 F.3d 993, 1001 (9th Cir. 2005).

The Court finds Gonzalez failed to fairly present Claims 2, 3, 9 and 11.

**Procedural Default**

Gonzalez asks that the Court allow him to return to state court with any claims it determines are unexhausted.  Respondents argue that the claims not yet fairly presented in state court are not unexhausted but, rather, technically exhausted and procedurally defaulted.  Thus, the next step is for the Court to assess whether Petitioner presently has an available remedy in state court for these claims.  *See Coleman v. Thompson*, 501 U.S. at 735 n.1; *Ortiz v. Stewart*, 149 F.3d at 931.

All of the claims found not to have been fairly presented could have been raised on appeal or in Gonzalez's first PCR petition, therefore, if he were to raise them in a successive PCR petition they would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure.  This is confirmed by the fact that Gonzalez does not argue he meets any of the exceptions to preclusion set forth in the Arizona Rules of Criminal Procedure – defendant's sentence has expired, newly discovered material evidence probably would have changed the verdict or sentence, failure to timely file an appeal or PCR notice was not defendant's fault, a significant change in the law would probably change the conviction or sentence, or by clear and convincing evidence no reasonable fact-finder would have found defendant guilty.  Ariz. R. Crim. P. 32.1(d), (e), (f), (g), (h), 32.2(a), 32.2(b).

Gonzalez's only basis for arguing that he has a remedy available in state court is that the claims, in particular his IAC claims, are of such constitutional magnitude that they can be raised in a subsequent collateral proceeding. The Comment to Rule 32.2 provides that when a claim is of "sufficient constitutional magnitude" that personal knowledge is required to waive the constitutional right at issue, a Rule 32.2(a)(3) waiver requires the state to show the right was "knowingly, voluntarily and intelligently" waived. Review of the claims at issue suggest they do not arise out of fundamental constitutional rights requiring personal waiver, and Petitioner has not attempted to demonstrate otherwise. *See Stewart v. Smith*, 202 Ariz. 446, 449-50, 46 P.3d 1067, 1070-71 (2002) (citing as examples of rights requiring personal waiver, right to counsel and right to a jury trial by twelve persons). With respect to IAC claims, the Arizona Supreme Court has explicitly held that, regardless of the facts underlying the claim, if IAC has been raised in a PCR proceeding any subsequent IAC claim is precluded.[3] *Id.* at 450, 46 P.3d 1071. Because Gonzalez's claims are not based on constitutional rights requiring personal waiver and he does not meet any of the preclusion exceptions, he presently does not have a remedy available in state court. Therefore, Claims 2, 3, 6 (in part), 7, 8/13, 9, 11, 15 (in part), 16 (in part), and 17 (in part) are technically exhausted but procedurally defaulted.

Because these claims are not unexhausted as asserted by Gonzalez, and there is not a remedy available in state court, a stay as requested by Gonzalez is not appropriate. *Cf. Rhines v. Weber*, 544 U.S. 269, 273-74 (2005) (allowing a stay while a petitioner exhausts claims in state court only as to claims that are truly unexhausted).

---

[3]  Petitioner argues, to the contrary, that IAC claims can be raised in a subsequent PCR proceeding, pursuant to Rule 32.2. In support he cites *State v. Spreitz*, 190 Ariz. 129, 945 P.2d 1260 (1997). That case is inapposite on this issue and stated only that it would address IAC claims on direct appeal in the event they were meritless. *Id.* at 146, 945 P.2d at 1277. In *Stewart v. Smith*, the Arizona Supreme Court cited its subsequent ruling, on Spreitz's petition for review from denial of PCR, for the proposition that all IAC claims should be resolved in one proceeding to avoid piecemeal litigation. 202 Ariz. at 449, 46 P.3d at 1070 (citing *State v. Spreitz*, 202 Ariz. 1, 39 P.3d 525 (2002)).

**Claim 14**

In Claim 14, Gonzalez alleges the police destroyed exculpatory evidence in violation of his right to due process and a fair trial. Respondents concede that Gonzalez fairly presented this claim in a supplemental PCR petition. (Doc. 18, Ex. H.) Respondents argue, however, that the PCR court found this claim waived for failure to raise it on appeal and that it is procedurally defaulted. To the contrary, the PCR court did not mention this claim specifically and did not find any claims waived for failure to raise them on appeal. (*See id.*, Ex. J.) Because Gonzalez fairly presented Claim 14 and it was not barred by the state court, the Court will address it on the merits.

**Cause and Prejudice**

Gonzalez contends there is cause and prejudice to overcome any defaults found by the Court. Ordinarily "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753. Gonzalez argues that the cause for failure to exhaust the claims is ineffective assistance of trial and appellate counsel.

Before ineffectiveness may be used to establish cause for a procedural default, it must have been presented to the state court as an independent claim. *Murray v. Carrier*, 477 U.S. 478, 489 (1986). Petitioner did not allege in his PCR petition that his trial or appellate counsel were ineffective for failing to raise any claims. (Doc. 18, Exs. G-J.) Ineffectiveness claims regarding counsel are now foreclosed in state court by Arizona Rule of Criminal Procedure 32.2(a)(3) and 32.4(a). Because the Arizona state courts have not had a fair opportunity to rule on Petitioner's ineffectiveness claims alleged as cause, and Petitioner may not exhaust these claims now, they are technically exhausted but procedurally defaulted. *See Gray*, 518 U.S. at 161-62; *Coleman*, 501 U.S. at 735 n.1. Therefore, Petitioner's allegations of ineffective trial and appellate counsel cannot constitute cause to excuse the default. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (ineffective counsel as cause can itself be procedurally defaulted).

Additionally, a failure to exhaust did not occur at the trial court level. Rather, to the extent Gonzalez failed to exhaust claims it is based on a failure to raise or federalize the claims on direct appeal or in the PCR proceeding. Therefore, any conduct on the part of trial counsel cannot serve as cause for the failure to properly exhaust the claims in state court.

To the extent Gonzales is asserting that his pro se status at the time he filed his PCR petition is cause for his failure to raise claims in that proceeding, that argument has been rejected. *See Hughes v. Idaho State Bd. of Corrections*, 800 F.2d 905, 909 (9th Cir. 1986) (holding illiteracy was not cause for pro se petitioner's failure to raise a claim in state court).

Because Petitioner has not established cause to overcome the default, the Court need not analyze prejudice. *Thomas v. Lewis*, 945 F.2d 1119, 1123 n.10 (9th Cir. 1991).

### **Miscarriage of Justice**

Gonzalez argues generally that it would be a miscarriage of justice for the Court not to review his defaulted claims. If a petitioner cannot meet the cause and prejudice standard, the Court still may hear the merits of procedurally defaulted claims if the failure to hear the claims would constitute a "fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995). To demonstrate a fundamental miscarriage of justice based on factual innocence of the crime, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 327. To establish the requisite probability, the petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* The Supreme Court has characterized the exacting nature of an actual innocence claim as follows:

> [A] substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. . . . To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

*Id.* at 324; *see also House v. Bell*, 547 U.S. 518, 538 (2006).

Gonzalez has not argued that he is actually innocent of the crimes nor has he

attempted to meet this standard. Critically, he does not identify any "new evidence" that would establish his innocence. Petitioner fails to establish that there will be a fundamental miscarriage of justice if the Court does not consider his defaulted claims.

### Conclusion

Gonzalez did not fairly present in state court Claims 2, 3, 6 (in part), 7, 8/13, 9, 11, 15 (in part), 16 (in part), and 17 (in part). He does not presently have a remedy available in state court for these claims. The claims are technically exhausted but procedurally defaulted. Petitioner has not established cause and prejudice to overcome the default or that a fundamental miscarriage of justice will result if the Court does not review these claims.

### MERITS

The Court reviews the exhausted claims on the merits, Claims 1, 4, 5, 6 (as to Duran), 10, 12, 14, 15(e), (h) and (i), 16(A) (4), (7)(a) and (8), 17(A), and 17(B)(1).

### Legal Standard for Relief Under the AEDPA

The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v.*

*Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context

where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable," the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 550 U.S. at 473; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 550 U.S. at 473-74; *Miller-El II*, 545 U.S. at 240.

**Claim 1 (Trials I and II)**

Gonzalez alleges that the jury instruction on premeditation, used at both trials, relieved the state of its burden of proving actual reflection, which violated the Sixth Amendment and amounted to structural error. At each trial, the court gave the following instruction:

> Premeditation means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by any length of time to permit reflection. It is this period of time that distinguishes second degree murder from first degree murder. Proof of actual reflection is not required, but an act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

(RT 5/23/02 at 172-73; RT 10/11/02 at 21-22.) The Arizona Court of Appeals found that this instruction was erroneous because the state is required to prove reflection; however, it found the error harmless and denied the claim. (Doc. 18, Ex. D at 4-5.) That ruling was based on *State v. Thompson*, 204 Ariz. 471, 480, 65 P.3d 420, 429 (2003), in which the Arizona Supreme Court found erroneous a premeditation instruction, such as that given in Gonzalez's

- 16 -

trials, that stated "actual reflection is not required."

Due process requires that the state prove every element of a crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979). Petitioner's allegation is that the premeditation jury instruction relieved the prosecution of the burden of proving actual reflection beyond a reasonable doubt. Further, Gonzalez argues this error is structural and not subject to a harmless error analysis. Respondents do not dispute the instruction given was erroneous, but they contend the error was harmless.

The Supreme Court has rejected Gonzalez's argument, based on *Sullivan v. Louisiana*, 508 U.S. 275 (1993), that this type of error is structural and not subject to harmless error review. *See Neder v. United States*, 527 U.S. 1, 10-11 (1999). An improper instruction as to one element of an offense, whether it is omitted or improperly stated, is subject to harmless error analysis. *Id.* at 9. Thus, the question is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 15 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

Trial I

As discussed by the appellate court, there was ample evidence of premeditation:

> [A] week before shooting M[ark], Gonzalez had called A[lyssa] and had told her that he blamed M[ark] for the fact that Gonzalez could not see his daughter. On the night of the shooting, Gonzalez arrived at M[ark]'s apartment carrying a weapon. Gonzalez immediately asked about his daughter, which resulted in an argument culminating in Gonzalez's shooting M[ark]. And the instruction given properly covered any defense that the shooting was the instant effect of a sudden quarrel.

(Doc. 18, Ex. D at 5.) Additionally, during the several minutes of verbal argument, Mark Humo and Alyssa Preciado asked Gonzalez to put down the gun and "fight like a man," but Humo never touched Gonzalez prior to the shooting. (RT 5/21/02 at 163, 165-66.) Gonzalez suggests that when he told Humo he would be back that Humo escalated the confrontation by moving closer and challenging him to take care of things right then. (Doc. 1 at 27 (citing RT 5/21/02 at 162).) Although there was a confrontation between the two men, it was not

sudden but was precipitated by Gonzalez appearing with a gun to confront Humo. The fact that Gonzalez suggested he was going to leave, but did not, supports reflection before acting to shoot Humo not a lack of reflection as Gonzalez argues. Additionally, Gonzalez shot at Humo after he turned and tried to run away. (RT 5/21/02 at 170-71.) These facts, along with all the evidence presented at trial, demonstrate that the shooting was premeditated.

Further, Gonzalez argued two defenses to the charge of attempted first degree murder, neither of which was tied to whether the shooter actually reflected. One, Gonzalez argued that there was not proof beyond a reasonable doubt that he was the shooter. (RT 5/24/02 at 14.) This defense was not impacted at all by the erroneous premeditation instruction. Second, Gonzalez argued that the shooting was not premeditated because it was the instant effect of a sudden quarrel. (RT 5/23/02 at 200; RT 5/24/02 at 13-14.) The instruction accurately represented that an act was not premeditated if it was impulsive, the instant effect of a sudden quarrel. Again, this defense was not impacted by the erroneous language in the instruction. The jury's verdict indicates they clearly rejected both of these defenses.

Because the trial evidence established that the shooting was premeditated, and Gonzalez's defense was not compromised by the erroneous portion of the instruction, it appears beyond a reasonable doubt that the error did not contribute to the verdict. Thus, the error was harmless and the Arizona Court of Appeals' denial of this claim was not an objectively unreasonable application of federal law.

Trial II

In the second trial, the appellate court found sufficient evidence of premeditation was presented and not rebutted: "Gonzalez testified that he had purchased the gun about a week before the incident. Gonzalez also testified that he had shot L[ewis] in self-defense, admitting that he had intentionally fired his gun at L[ewis] knowing that by pulling the trigger he would likely kill him." (Doc. 18, Ex. D at 5.)

The thrust of defense counsel's closing argument was that Gonzalez acted in self defense, not that there was a lack of premeditation. (RT 10/11/02 at 69-99.) Counsel did

argue briefly that Gonzalez did not have time to premeditate. (*Id.* at 97.) However, this was contrary to Gonzalez's trial testimony:

Q. As far as this officer, sir, you were afraid Sergeant Lewis was going to shoot you, so you decided to pull your trigger and shoot him first?

A. Yes.

. . . .

Q. You were shooting at the person in the truck, were you not, sir?

A. Yes, I was.

Q. So that was your intention, whether it be to defend yourself or not was to shoot the person inside that truck.

Correct, sir?

A. Yes.

. . . .

Q. So is it fair to say, you knew when you pointed that gun at the person in the truck and you pulled the trigger, you knew that that would kill the person in the truck.

Did you not, Mr. Gonzalez?

A. Yeah, I knew that.

(RT 10/10/02 at 266-68.) Gonzalez testified that he did not shoot at Officer Blue because he thought by the time he could take out his gun and turn to shoot him, that he would have gotten shot, and there was a girl nearby and he was afraid he would hit her. (*Id.* at 260-64.) He also stated that he had seen Officer Lewis in his truck and thought that if he turned around to shoot at Officer Blue, then Officer Lewis would have shot him. (*Id.* at 262, 263, 267.) Gonzalez's testimony reveals clearly he knew that firing his weapon at Officer Lewis would kill him. He reflected upon this knowledge prior to pulling the trigger, enough to decide not to shoot at Officer Blue but to aim his weapon at Officer Lewis with that knowledge.

Gonzalez argues that there was no time to reflect and that firing his weapon was

merely a natural reaction in the face of being accosted by unknown armed men, which amounted to a sudden quarrel or heat of passion. First, his trial testimony recited above establishes that he reflected before shooting his weapon. Whether he knew that he was shooting at an officer is irrelevant to the element of premeditation. Second, his counsel's closing argument did not suggest the shooting was the instant effect of a sudden quarrel. Further, the instruction accurately represented that an act was not premeditated if it was impulsive, the instant effect of a sudden quarrel. Thus, it is clear the jury did not find the shooting to be the result of a sudden quarrel.

Because the trial evidence established that the shooting was premeditated, and Gonzalez's defense was not compromised by the erroneous portion of the instruction, it appears beyond a reasonable doubt that the error did not contribute to the verdict. Thus, the error was harmless and the Arizona Court of Appeals' denial of this claim was not an objectively unreasonable application of federal law.

**Claim 4 (Trial I)**

Gonzalez alleges that he was denied due process and a fair trial by the admission of 9-millimeter shell casings from his car.

Prior to trial, Gonzalez moved to preclude evidence regarding two 9-millimeter shell casings found in his car after the Humo shooting. (RT 5/21/02 at 65.) The State argued that the casings were relevant because they could be associated with the .38-caliber bullet found in the Humo shooting. (*Id.*) At that time, Detective Cassel informed the court that there was a revolver that could shoot 9-millimeter and .38-caliber rounds. (*Id.* at 66.) The judge denied the motion to preclude.[4] (*Id.* at 67.)

Detective Denogean testified at trial that he found two 9-millimeter shell casings in Gonzalez's car after the Humo shooting and that those casings were associated with a

---

[4] Gonzalez intermingles within this claim arguments about the ineffectiveness of his counsel regarding this evidence. This is a separate claim (Claim 16(A)(7)(a)), therefore, the Court does not address those arguments within the discussion of Claim 4.

semiautomatic weapon.  (RT 5/22/02 at 30, 47.)  Detective Cassel testified that the bullet removed from Humo was a .38-caliber, which could be fired by a revolver or a semiautomatic weapon, including a 9-millimeter.  (RT 5/23/02 at 57.)  He stated that it was possible for a .38-caliber bullet to be associated with a 9-millimeter casing.  (*Id.* at 58.)  Detective Cassel testified that he could not tell whether the 9-millimeter casings found in the car came from a revolver or a semiautomatic gun.  (*Id.* at 84-85.)  He also testified that he could not tell if the .38-caliber bullet recovered from Humo's body was associated with one of the 9-millimeter casings found in the car, nor could he tell if the bullet was fired by a revolver or semiautomatic weapon.  (*Id.* at 88-89.)

The court of appeals denied this claim finding that:

> Although the evidence at trial did not establish whether the weapon that injured M[ark] was a .38-caliber or a nine-millimeter weapon, the state's expert testified that a particular type of revolver uses both kinds of bullets interchangeably.  Thus, the presence of the nine-millimeter shell casings in Gonzalez's car was marginally relevant to the issue of whether he had shot M[ark].

(Doc. 18, Ex. D at 8-9.)

This Court may only grant habeas relief on a claim alleging erroneous admission of evidence if the evidence "rendered the trial fundamentally unfair" in violation of due process.  *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1466 (9th Cir. 1986); *Estelle v. McGuire,* 502 U.S. 62, 70 (1991); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  The United States Supreme Court has "very narrowly" defined the category of infractions that violate the due process test of fundamental fairness.  *Dowling v. United States*, 493 U.S. 342, 352 (1990).

Gonzalez argues that the shell casings were the only physical evidence used to establish a connection between him and the shooting.  With further investigation, Gonzalez argues that he may be able to prove that the 9-millimeter shell casings and the bullet recovered from Humo's body have no relation to one another.  In light of this possibility, he argues that admission of this evidence was highly prejudicial.

Gonzalez argues that the prosecutor highlighted the evidence of the casings in closing

arguments. In her initial closing argument, the prosecutor did not mention the 9-millimeter

casings. (RT 5/23/02 177-95.) Defense counsel, however, made the following argument

regarding the casings in her closing argument:

> Casings. If the casings are related to this case and I'm not suggesting to you the casings may not be related to the case. If the casings that are found in Robert Gonzalez's car are somehow related to this shooting, then do you want those fingerprinted to see, is Robert Gonzalez connected to the casings? Now, are the casings connected? Well, again, physical evidence by – physical testing by a criminal lab would have told you that.
>
> It seems that the State's theory is that it's a revolver that shot Mr. Humo, both from Mr. Humo saying it's a revolver and the fact that there are no casings found at the scene. And there's no evidence of the shooter gathering up casings at the scene. There were no casings found at the scene. A semiautomatic weapon would fire bullets and they would expect that the casings would be expected to be seen in the parking lot of the Preciado apartment complex.
>
> It would be nice to know whether the casings that are in the car are related to a revolver or not, because if all the evidence is that the casings that the shooter had were from a revolver and there are casings in Robert Gonzalez's car that are for a revolver, then that is a step for you to say, Robert Gonzalez did it. And equally, the fact that you don't know the answer to that is one of the reasonable doubts you should have in this case.
>
> You know from the testimony I elicited from Detective Cassel that if it's a semiautomatic, there's going to be two ejector marks on the casings, such as ballistics could look at those casings, and be able to tell if it's a semiautomatic or revolver.
>
> Detective Cassel can't look at the casings himself, just by looking at them, eyeballing them and be able to tell if they are revolver or a semiautomatic, but an expert could tell whether there are ejector marks on them.

(RT 5/24/02 at 10-11.) In response to the defense attorney's argument, in her closing

rebuttal, the prosecutor argued:

> Fingerprint the shell casings. Fingerprint the shell casings could have proven that Robert Gonzalez touched some shell casings in his car, nothing more than that. We didn't have the gun, Ladies and Gentlemen. He wasn't stupid enough to leave the gun in his car when he parked it behind the house on Knox Street that night without the gun. We couldn't prove these shell casings came from the weapon, couldn't prove these shell casings came from the same bullet that was taken from Humo.
>
> All that would have proven was that Robert Gonzalez' fingerprints were on the shell casings, which are found in Robert Gonzalez' car. It's just a red herring.

1    (RT 5/24/02 at 31-32.)

2         Detective Cassel's testimony established only that the 9-millimeter casings and the

3    .38-caliber bullet that hit Humo could be associated with each other and both could be

4    associated with the same gun.  Contrary to Gonzalez's argument (Doc. 21 at 36), review of

5    the prosecutor's closing argument reveals that she did not rely on, or even mention, that the

6    casings and the bullet were consistent with one another.  Gonzalez argues that he can

7    demonstrate that the bullet could not have been directly linked to the shell casing.  Even if

8    true, as found by the state courts, the shell casings were marginally relevant because they

9    could be compatible with a gun that could have shot the .38-caliber bullet recovered from

10   Humo.

11        Even if the shell casings were not relevant, their admission did not render Gonzalez's

12   trial fundamentally unfair.  In the end, the defense relied on them more than the prosecution

13   to argue there was reasonable doubt as to whether Gonzalez was the shooter.  The admission

14   of the shell casings was not critical evidence linking Gonzalez to the shooting.  The critical

15   evidence was that three eye witnesses identified Gonzalez as the shooter and/or his car as

16   present at the shooting.  In the face of that evidence, the casings had no impact on the verdict

17   and did not violate his right to due process.  At a minimum, the Arizona Court of Appeals'

18   decision denying this claim was not objectively unreasonable.

19        Petitioner requests discovery and an evidentiary hearing regarding this claim.  It is

20   self-evident that when reviewing a claim of trial court error regarding admission of evidence,

21   this Court reviews the evidence that was before the trial court at the time it made the

22   decision. There is no material factual dispute requiring an evidentiary hearing, *see Townsend*

23   *v. Sain*, 372 U.S. 293, 312-13 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504

24   U.S. 1 (1992), *and limited by* § 2254(e)(2), because this is strictly a record-based claim.

25   Because Claim 4 must be decided based on the state court record, neither discovery nor an

26   evidentiary hearing is warranted.

27

28

1        **Claim 5 (Trial I)**

2        Gonzalez alleges he was denied the right to present a complete defense by the trial

3   court's preclusion of impeachment testimony of Humo. Specifically, Gonzalez wanted to

4   establish that Humo had warrants out for his arrest, which the state refrained from serving

5   on him, he had tattoos indicating gang membership, and he had prior convictions.[5]

6        Legal Standard

7        Due process provides a defendant the right to a fair opportunity to present a defense

8   to the State's accusations. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). When these

9   rights are restricted in a way that deprives a defendant of a fair trial in violation of due

10  process, he is entitled to relief. *Id.* at 302 (trial court excluded "critical evidence").

11  However, a defendant does not have "an unfettered right to offer testimony that is

12  incompetent, privileged, or otherwise inadmissable under standard rules of evidence."

13  *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). States have the power to "exclude evidence

14  through the application of evidentiary rules that themselves serve the interests of fairness and

15  reliability," and judges have wide latitude to exclude evidence that is "marginally relevant"

16  or would cause confusion of the issues. *Crane v. Kentucky*, 476 U.S. 683, 689-90 (1986)

17  (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Chambers*, 410 U.S. at 302).

18       Warrants

19       Prior to trial, defense counsel moved to introduce evidence that Humo had outstanding

20  misdemeanor warrants for his arrest and he was not being arrested on them as a benefit for

21  his testimony. (RT 5/21/02 at 71.) The prosecutor attested to the court that she had no

22  knowledge of the warrants prior to defense counsel bringing them to her attention and that

23  Humo was not receiving any benefit for his testimony. (*Id.*) The trial court denied the

24  request because Gonzalez had not established the prosecution knew about the warrants. (*Id.*

25  _____

26       [5] Respondents fail to acknowledge the third part of this claim regarding Humo's prior
     convictions. Review of Gonzalez's appellate brief indicates this portion of the claim was not
27   fairly presented in state court. (Doc. 18, Ex. B at 25-28.) Regardless, the Court will address
     this part of the claim because it is meritless. *See* 28 U.S.C. § 2254(b)(2).
28

at 72.)  The court of appeals found the trial court was within its discretion to deny admission of the warrants because the prosecutor avowed that she first learned of the warrants from Gonzalez's motion in limine.  (Doc. 18, Ex. D at 11.)  The court found Gonzalez's argument – that Humo was not being arrested on the warrants as a benefit for his testimony – was based entirely on conjecture and the evidence was properly precluded.  (*Id.*)

In this Court, Gonzalez again argues he should have been allowed to introduce the warrants for Humo's arrest because they demonstrated he was receiving a benefit for his testimony.  The state court found that Gonzalez had not demonstrated that Humo was receiving any benefit.  This Court must defer to the factual findings of the state courts.  28 U.S.C. § 2254(e)(1).  Because Humo was not receiving any benefit from his testimony, there was no basis to admit the outstanding misdemeanor warrants.  Preclusion of Humo's arrest warrants did not render Gonzalez's trial unfair in violation of due process.

Tattoos

During Humo's testimony, Gonzalez sought to admit photographs of the tattoos on Humo's torso to establish that he was affiliated with a gang in support of Gonzalez's argument that someone else had reason to confront and shoot Humo.  (RT 5/21/02 at 190.) After the court heard argument and opinions on the tattoos, the judge precluded the pictures because there was no basis to find that Humo's tattoos were gang-related.  (*Id.* at 195-204.) The court of appeals found that evidence of Humo's tattoos was properly excluded as irrelevant because evidence before the trial court established that the tattoos were not gang-related.  (Doc. 18, Ex. D at 12.)

To counter the state court factual finding, that the tattoos were not gang-related, Gonzalez argues only that the jury should have been able to reach that decision for itself. This court must defer to the state court fact finding that Humo's tattoos were not affiliated with a gang.  *See* 28 U.S.C. § 2254(e)(1).  Based on that factual finding, the evidence was irrelevant to Gonzalez's defense and preclusion of the evidence did not deny his right to a fair trial.

1          Prior Convictions

2          Prior to trial, the court agreed that Gonzalez could introduce the fact of Humo's prior

3    felony conviction, without disclosing the nature of the felony, but the court precluded

4    evidence of his shoplifting conviction. (RT 5/21/02 at 68-69.) The prosecutor indicated she

5    had no knowledge of Humo having a federal conviction. (*Id.* at 69.) Later that day, the

6    prosecutor informed the court and defense that Humo had a federal conviction for aggravated

7    assault. (*Id.* at 92.) On cross-examination, Gonzalez's counsel brought out the fact that

8    Humo had two felony convictions, a state one from 1996 and a federal one from 1998. (RT

9    5/22/02 at 10-11.) With respect to prior convictions, the prosecutor made this argument in

10   her closing rebuttal:

11           Number one, it says you may consider the fact that a witness has prior felony
         convictions in determining whether that witness is believable. Now, Ladies
12       and Gentlemen, as a prosecutor I certainly don't condone crime. I certainly
         don't condone the use of marijuana, but if someone is convicted of possessing
13       marijuana, they're convicted of a felony. Does that automatically make them
         a liar?
14
             If someone is convicted of say, a felony DUI, doesn't mean they're –
15       again, I don't condone drinking and driving, but that, does that automatically
         make you a liar? I'm not saying that that's a good thing that Mr. Humo has
16       prior felony convictions, but what I am saying is that does not automatically
         make him a liar.
17
             . . . .
18
         Felony convictions are just something you may consider and you can totally
19       likewise disregard them if you don't find them pertinent in the case.

20   (RT 5/24/02 at 23-24.)

21          Gonzalez alleges he had the right to confront Humo about the nature of his felonies

22   to demonstrate he had a propensity for violence. He also contends the shoplifting charge was

23   a crime of moral turpitude that he should have been allowed to use to impeach Humo's

24   honesty.

25          First, the basis for allowing admission of prior felonies under Arizona Rule of

26   Evidence 609 is that "a major crime entails such an injury to and disregard of the rights of

27   other persons that it can reasonably be expected the witness will be untruthful if it is to his

28

advantage." *State v. Green*, 200 Ariz. 496, 498, 29 P.3d 271, 273 (2001) (citations omitted). Gonzalez was allowed to impeach Humo with his felonies, the court instructed the jury they could use that evidence to assess his credibility (RT 5/23/02 at 170), and counsel argued in closing that Humo's convictions demonstrated he was untruthful (*id.* at 205). The judge was entitled to deny admission of evidence regarding the convictions if the prejudicial effect outweighed the probative value of the evidence. Ariz. R. Evid. 609(a); *see State v. Bolton*, 182 Ariz. 290, 303, 896 P.2d 830, 843 (1995) (finding preclusion of nature of the offense while allowing the fact of conviction minimized the risk of prejudice). Gonzalez has not established any basis under Arizona rules or law to use Humo's prior conviction to demonstrate a propensity for violence. To the extent Gonzalez wanted to establish Humo as a violent person, Humo testified that he had just been released from federal prison on the day of the shooting and he was previously a gang-banger that had lived a wild life on the streets. (RT 5/21/02 at 159, 163, 168, 181.) However, Gonzalez's counsel did not argue as a defense in closing that Humo was violent and confrontational, beyond the undisputed circumstances of the crime that Humo and the shooter were arguing. (RT 5/23/02 at 195-211; RT 5/24/02 at 4-15.) Thus, the court's restriction on Gonzalez's ability to prove the nature of Humo's prior convictions did not deprive him of a fair trial.

Gonzalez also alleges the prosecutor's closing argument was misleading because there was no evidence that Humo's convictions were for marijuana possession and DUI. The prosecutor used marijuana possession and DUI as examples of felonies that would not, in her opinion, necessarily implicate a witness's honesty. As Gonzalez argues, there was no evidence at trial regarding the nature of Humo's felonies, and the prosecutor merely used that void to argue that Humo's felony convictions did not mean the jury should discount his testimony. The prosecutor's argument was not misleading, rather, it was a reasonable attempt within the applicable law to support Humo's credibility.

Second, Gonzalez fails to show that Humo's shoplifting conviction was admissible under state rules. The Arizona Supreme Court has interpreted Arizona Rule of Evidence

609(a), allowing admission of misdemeanor convictions involving dishonesty or false statement, to be restricted to crimes "such as perjury, subornation of perjury, false statement, criminal fraud, embezzlement, false pretense, and other offenses in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully." *State v. Malloy*, 131 Ariz. 125, 127, 639 P.2d 315, 317 (1981). Following the federal courts' interpretation of the rule, the court found that theft and robbery are not within the bounds of Rule 609(a)(2), thus, shoplifting too would be inadmissible. *Id.*; *United States v. Ortega*, 561 F.2d 803, 806 (9th Cir. 1977) (finding shoplifting not a crime involving dishonesty or false statement). Additionally, in light of the other evidence admitted regarding Humo's criminal record and lifestyle, preclusion of this evidence did not deprive Gonzalez of a fair trial.

### Claim 6 (Trial I)

Gonzalez alleges the trial court's preclusion of witness Joe Duran as a sanction for late disclosure violated his right to due process under the Fourteenth Amendment and compulsory process under the Sixth Amendment.

Gonzalez's counsel represented to the trial court that Duran was disclosed as a witness in a pretrial statement, however, the defense was not able to serve him with a subpoena and hear what he had to offer as testimony until ten days before trial. (RT 5/21/02 at 86-87.) They were not able to interview him until the day before trial, at which time the prosecutor was not available. (*Id.* at 87.) Counsel represented that Duran would testify that "he overheard Mr. Gonzalez's side of a conversation. He picked up the phone, it was Alyssa, he handed the phone to Mr. Gonzalez. Then he overheard Mr. Gonzalez's portion of a conversation where it appeared to him Mr. Gonzalez was getting upset because of the things Ms. Preciado was saying." (*Id.* at 88.) The court found the relevance of Duran's testimony "very tenuous," and granted the motion to preclude due to the late disclosure and inability for the prosecution to prepare. (*Id.*)

The court of appeals found that Duran's proposed testimony demonstrated only that

Gonzalez was angry at Preciado. (Doc. 18, Ex. D at 10.) It held that its relevance was not vital and "very tenuous." (*Id.*) Further, because the defense was able to cross-examine Preciado regarding her relationship with Gonzalez, the court found he was not prejudiced by the preclusion. (*Id.*)

A defendant has the right to a fair opportunity to present a defense to the State's accusations, including calling witnesses on his behalf, based on the Due Process Clause of the Fourteenth Amendment and the Compulsory Process Clause of the Sixth Amendment. *Chambers*, 410 U.S. at 294; *Taylor*, 484 U.S. at 408-09. However, judges have wide latitude to exclude evidence that is "marginally relevant." *Crane*, 476 U.S. at 689-90 (citing *Van Arsdall*, 475 U.S. at 679; *Chambers*, 410 U.S. at 302). Further, the deprivation of a particular witness's testimony does not violate either the Sixth or Fourteenth Amendment unless the defendant makes a showing that the witness's testimony was material and favorable. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 872 (1982).

Gonzalez fails to demonstrate that Duran's testimony was material. He asserts that Duran would have testified that Preciado had animosity against Gonzalez and this led her to accuse him of the shooting. (Doc. 1 at 48.) A review of the proffer made in state court indicates that Gonzalez's characterization overstates Duran's personal knowledge. As found by the appellate court, Duran heard only Gonzalez's side of a conversation, which indicated Gonzalez was upset. Duran could not hear Preciado's portion of the conversation and Gonzalez has proffered no basis to believe Duran could support his defense that Preciado wrongly accused Gonzalez because of her anger at him. Because this evidence was not material, its exclusion did not violate Gonzalez's constitutional rights.

**Claim 16(A) (Trial I)**

Gonzales alleges he was denied effective assistance of counsel at his first trial because trial counsel failed to: (4) object to testimony about a mug shot taken prior to either of the shootings at issue in the trial or to challenge the reliability of that identification; (7) obtain a ballistics expert; and (8) challenge the State's closing argument stating that the victim had

four bullet wounds when he only had two.

Legal Standard

The governing federal law standard for claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 686 (1984), which recognizes a right to "effective assistance of counsel" arising under the Sixth Amendment. The *Strickland* standard for IAC has two components. A defendant must first demonstrate that counsel's performance was deficient, *i.e*., that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed a defendant by the Sixth Amendment. 466 U.S. at 687. It requires the defendant to show that counsel's conduct "fell below an objective standard of reasonableness." *Id.* at 687-88. Counsel's performance is strongly presumed to fall within the ambit of reasonable conduct unless petitioner can show otherwise. *Id.* at 689-90. Second, a defendant must show that the mistakes made were "prejudicial to the defense," that is, the mistakes created a "reasonable probability that, but for [the] unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Subclaim 4

Gonzalez alleges that his counsel failed to object to the use of a mug shot taken before the shooting of Humo, in October 2001, which was shown to witness Miguel Camarena. Gonzalez alleges that testimony regarding this photo informed the jury that he had a prior conviction and that the admission of the photographic identification was unreliable.

The prosecutor showed Camarena a photograph, Exhibits 37 and 37A (enlarged), and asked if he recognized the person. (RT 5/22/02 at 88.) He identified the person as the driver of the car, who was the person that shot Humo. (*Id.* at 88, 95) Camarena testified that no one ever asked him to pick the shooter out of a photographic line up. (*Id.* at 134.) Initially, Camarena stated that he did not recognize anyone in the courtroom. (*Id.* at 86.) He later identified Gonzalez as the driver and shooter on November 3, 2001. (*Id.* at 118, 137, 161.)

At a bench conference, Gonzalez's counsel did not object to the prosecutor having Detective Cassel identify and lay the foundation for admission of the photograph. (RT

5/23/02 at 103-04.) Defense counsel requested only that the actual date of the photograph not be elicited, so the jury would not hear it was taken prior to the shooting; the prosecutor agreed to that limitation. (*Id.* at 104-05.) Detective Cassel testified that the photograph of Gonzalez was taken near in time, within three to four weeks of the offense. (*Id.* at 112.) The blown-up version of the photograph, Exhibit 37A, was admitted without objection. (*Id.* at 112-13.)

The PCR court denied this claim finding that the photograph was relevant for identification purposes because Gonzalez's appearance was markedly different at the time of trial. (Doc. 18, Ex. J at 1.) Further, the court found that Gonzalez had not shown any prejudice from its admission. (*Id.*)

In this Court, Gonzalez has not demonstrated that he was prejudiced by counsel's action with respect to the photograph. Contrary to his argument, admission of a mug shot from "near in time" to the shooting did not inform the jury that Gonzalez had a prior conviction. A booking photo does not equate to a conviction. Further, the jury could have thought the photo was affiliated with the case currently before them, the Humo shooting.

Gonzalez has not shown that if counsel had objected the photograph would have been precluded. Additionally, although Gonzalez argues that counsel should have requested an identification hearing, he does not articulate the steps necessary to win such a motion nor explain why such a motion would have been successful. His failure to demonstrate that, if counsel had acted as he alleges she should have, the action would have been successful, precludes a finding of prejudice. *See Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986) (petitioner most prove an issue is meritorious to establish counsel failed to act competently); *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing *Morrison,* 477 U.S. at 373-74). Further, he has not established that if the photograph had not been admitted there is a reasonable probability he would not have been convicted. Initially, Camarena identified Gonzalez's car, which was affiliated with the shooting, and later in his testimony he identified Gonzalez as the shooter. Humo and Preciado also identified Gonzalez as the

shooter.  The PCR court's denial of this claim was not an objectively unreasonable application of *Strickland*.

Subclaim 7(a)

Gonzalez alleges counsel was ineffective for failing to obtain a ballistics expert to counter the testimony of Detective Cassel regarding the 9-millimeter shell casings.  The PCR court denied this claim finding that Gonzalez had not called Detective Cassel's testimony into question and, without the evidence of the casings in his car, there was sufficient evidence from Humo and Preciado to connect him to the shooting.  (Doc. 18, Ex. J at 2.)

Resolution of this claim is driven by the Court's analysis as to Claim 4.  As found above, in light of the eyewitness testimony in this case, the admission of the casings and the related testimony had no impact on the verdict.  Therefore, Gonzalez was not prejudiced by his counsel's failure to obtain expert testimony to counter the evidence regarding the casings found in his car.  The PCR court's denial of this claim was not an objectively unreasonable application of *Strickland*.

Petitioner requests discovery and an evidentiary hearing with respect to this claim. He seeks to present the evidence he contends counsel should have developed and presented at trial.  To establish a right to either discovery or an evidentiary hearing, Petitioner must demonstrate that, if allowed to fully develop the facts he alleges, he will be entitled to relief. *See Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997); *Townsend*, 372 U.S. at 312-13.  Because the Court has determined that Petitioner is not entitled to relief on this claim based on his allegations, there is no basis for discovery or an evidentiary hearing.

Subclaim 8

Petitioner alleges his counsel was ineffective for failing to challenge the prosecutor's closing argument, in which she stated that Humo had four bullet wounds when in fact he was only shot twice.  The PCR court denied this claim finding that Gonzalez had not established how correcting this discrepancy would have impacted the verdict.  (Doc. 18, Ex. J at 1.)

The information before the Court does not establish with certainly how many times

Humo was shot. In the grand jury proceeding, Detective Michael Carroll testified that Humo was hit with two bullets. (Doc. 1, Ex. O at 5.) At trial, Humo testified that he was shot four times, once in the left side of his ribs and then three in his left butt area. (RT 5/21/02 at 176.)

Petitioner argues that it was a critical failure of counsel not to clarify the number of bullet wounds Humo suffered because the additional bullets supported the prosecutor's argument that the crime was attempted first degree murder. The Court disagrees. It is undisputed that Gonzalez fired at least four shots because Humo was struck at least twice and two bullets were lodged in the wall of the apartment building. Further, it is undisputed that Gonzalez fired at Humo after he turned and was attempting to run away. Whether Gonzalez struck him two or four times is irrelevant to the elements for attempted first degree murder. The PCR court's finding that Petitioner had not established prejudice was not objectively unreasonable.

**Claim 10 (Trial II)**

Gonzalez alleges the self defense instruction shifted the burden of proof to him in violation of due process, and that the subsequent change in the law should have retroactively applied to him. In 1997, and at the time of Gonzalez's trial, the Arizona statute provided that a defendant had to prove self-defense by a preponderance of the evidence. A.R.S. § 13-205 (1997, amended 2006). In 2006, the legislature amended that provision and placed the burden on the prosecution to prove beyond a reasonable doubt that the defendant did not act in self-defense. A.R.S. § 13-205 (2006).

Gonzalez raised this claim in a supplement to his PCR petition. (Doc. 18, Ex. I.) The PCR court held that the change in the law was not retroactive and only applied to cases tried after the 2006 effective date. (Doc. 18, Ex. J at 2.)

Retroactivity

The Arizona Supreme Court held that the 2006 changes to the affirmative defense and justification defense statute were not retroactive and applied only to offenses occurring on or after its effective date of April 24, 2006. *Garcia v. Browning*, 214 Ariz. 250, 254, 151

P.3d 533, 537 (2007). In discussing a state court's finding that a state law was not retroactive, the Supreme Court found that "the Federal Constitution has no voice upon the subject." *Great N. Ry. Co. v. Sunburst Oil & Ref. Co.*, 287 U.S. 358, 364 (1932); *see LaRue v. McCarthy*, 833 F.2d 140, 142-43 (9th Cir. 1987). Thus, the Arizona court's finding that the 2006 self-defense statute was not retroactive raises no constitutional issue for this Court to review.

Due Process

The jury was instructed as to self-defense, in part: "The burden of proving that one acted in self-defense rests with the defendant. The defendant must prove that he acted in self-defense by a preponderance of the evidence." (RT 10/11/02 at 26-27.) Gonzalez argues that these jury instructions on self-defense violated the Constitution.[6] He relies on the line of Supreme Court cases that held "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," and prohibits the shifting of the burden to a defendant to disprove any element. *In re Winship*, 397 U.S. 358, 364 (1970); *see Sandstrom v. Montana*, 442 U.S. 510, 524 (1979); *Mullaney v. Wilbur*, 421 U.S. 684, 703 (1975).

Neither these cases nor any subsequent Supreme Court case categorically prohibits placing the burden on the defendant to prove self-defense. To the contrary, the fact that most states place the burden on the State to disprove justification defenses, including Arizona as of 2006, "does not mean that those States that strike a different balance are in violation of the Constitution." *Patterson v. New York*, 432 U.S. 197, 211 (1977) (addressing the defense of extreme emotional disturbance); *Martin v. Ohio*, 480 U.S. 228, 236 (1987) (addressing self-defense). What is required is that the jury instructions placed the burden on the State to

---

[6]    Respondents acknowledge this argument (Doc. 18 at 28), however, they address only the question of retroactivity not whether the instruction itself violated the Constitution. Further, it is not apparent that this claim was fairly presented in state court (*see* Doc. 18, Ex. I); however, because Respondents did not argue exhaustion the Court will address this part of the claim and deny it on the merits. *See* 28 U.S.C. § 2254(b)(2).

prove each element of the crimes beyond a reasonable doubt and that the burden never shifted.

Review of the elements of the crimes and self-defense, and the instructions as a whole, demonstrate that this requirement was satisfied. The jury was instructed regarding the burden of proof on the State:

> The defendant has pled not guilty. This plea of not guilty means that the State must prove every part of each charge beyond a reasonable doubt.
>
> A defendant in a criminal case is presumed by law to be innocent. The law does not require a defendant to prove his innocence or to produce any evidence.
>
> The State has the burden of proving the defendant guilty beyond a reasonable doubt.

(RT 10/11/02 at 19-20.) For attempted first degree murder, the instructions at Gonzalez's trial required the jury to find the defendant, with intent, took a step in the course of first degree murder; first degree murder was defined as the defendant caused a death, knew or intended to cause the death, and he premeditated. (*Id.* at 21-22.) The aggravated assault charge required proof of the following elements: intentionally putting someone in reasonable apprehension of imminent physical injury, or knowingly or recklessly causing a physical injury; and, use of a deadly weapon or instrument. (*Id.* at 23-24.) The jury was instructed, in part, that a person is justified in using force against another when a reasonable person would have believed that deadly physical force was necessary to protect himself against the other's use or attempted use of unlawful deadly physical force. (*Id.* at 25.) The instructions placed the burden on the State and nothing in them shifted the burden on any element of a crime to defendant. The jury's guilty verdict demonstrates that none of the evidence, including the evidence offered regarding self-defense, raised a reasonable doubt and the State carried its burden of proving the crimes beyond a reasonable doubt. That is all that *Winship* requires. *See Patterson*, 432 U.S. at 206; *Martin*, 480 U.S. at 233-34.

Additionally, any constitutional infirmity in the instruction would have been merely harmless error. Gonzalez does not dispute the correctness of this instruction given to the

jury: "The threat or use of physical force against another is not justified to resisting an arrest that the person knows or should know is being made by a peace officer, whether the arrest is lawful or unlawful." (RT 10/11/02 at 27.) By way of interrogatory, the jury found *beyond a reasonable doubt* "that the defendant knew or should have known that the victim was a peace officer engaged in the execution of any official duty." (*Id.* at 122-23.) This finding negated the possibility of self-defense. Further, it demonstrated that the State proved beyond a reasonable doubt that Gonzalez did not act in self-defense, which is what Gonzalez contends the State should have been required to do. Therefore, any error was harmless.

The Arizona courts' denial of this claim was not an objectively unreasonable application of clearly established law. Claim 10 is without merit.

### **Claim 12 (Trial II)**

Gonzalez alleges there was insufficient evidence to support his convictions for attempted first degree murder, aggravated assault, and disorderly conduct on a police officer. The clearly established Supreme Court law governing this claim is set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which holds that when assessing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This type of claim is properly analyzed under the deferential standard of § 2254(d)(1); thus, the Court asks whether it was an objectively unreasonable application of *Jackson* for the Arizona Court of Appeals to deny this claim. *See Sarausad v. Porter*, 479 F.3d 671, 677-78 (9th Cir.), *vacated in part on other grounds*, 503 F.3d 822 (9th Cir. 2007).

The court of appeals denied this claim finding that it was the jury's role to resolve evidentiary conflicts and assess credibility:

> Gonzalez testified that he did not hear the officer announce that he was a police officer nor did he see any markings that identified the officer as such. He claimed that, when he saw one of the officers draw a weapon, he thought he was being attacked by rival gang members and shot back in self defense. In support of this argument, two other witnesses testified that they did not hear the officer announce that he was a police officer. But the supervising officer

testified that he repeatedly announced his identity, a statement that was corroborated by other witnesses. The officer also stated that he made eye contact with Gonzalez and left exposed his vest marked "police" to Gonzalez. Furthermore, L[ewis] testified that his gun was not visible to Gonzalez, and that the officer in charge had shot at Gonzalez only after Gonzalez had opened fire on L[ewis].

(Doc. 18, Ex. D at 18-19.)

With respect to this claim, Gonzalez contests only that one critical issue was not proven beyond a reasonable doubt – whether Gonzalez knew that Blue and Lewis were police officers prior to the shooting. He argues that the evidence did not demonstrate that Officer Blue announced his identity nor was there any other basis for him to know that Officers Blue and Lewis were with the police. Rather, he contends the police and civilian witnesses did not hear Officer Blue issue any warnings to Gonzalez.

Officer Blue testified that he announced his presence, telling Gonzalez repeatedly that he was a police officer and to get on the ground. (RT 10/9/02 at 57, 58-59, 79, 99.) Officer Blue and the other officers from his unit testified that such announcements are standard practice that Officer Blue always uses. (*Id.* at 78-79, 130-31, 188-89, 203-04.) The fact that none of the officers heard Officer Blue announce his identity was insignificant because the evidence demonstrated they were not in a position to have heard him.

Pauline Romero, a next door neighbor who was in the door of her house at the time, testified that the only thing she heard Officer Blue say was "something like," "What is up? What is up, Homes." (RT 10/10/02 at 119, 123.) On cross she acknowledged that, in her initial police interview, she stated that Officer Blue yelled, "stop," or something when Gonzalez began to run. (*Id.* at 135-36.) Alejandro Romero, Pauline's adult daughter who was outside her home, testified that she did not hear Officer Blue announce that he was an officer or ask Gonzalez to get on the ground. (*Id.* at 148-49.) She testified that she heard him say, "Hey," and in her initial interview she stated that Officer Blue might have said, "Hey, Homes, or Hey, You, or Stop." (*Id.* at 154-55.) Gonzalez testified that the only thing Officer Blue said was, "What's up, Homes." (*Id.* at 205, 209-10.)

Officer Blue testified that he was wearing a police vest when he exited his vehicle

with his gun pointed at Gonzalez. (RT 10/9/02 at 58.) Pauline Romero testified that when he stepped out of the car, Officer Blue was not wearing a vest. (RT 10/10/02 at 128.) Prior to the shooting, Alejandro Romero did not notice anything about Officer Blue that suggested he was a police officer, however, she did not pay attention and couldn't see if he had a vest on at the time. (*Id.* at 147-48, 150.) Looking out her window later, Alejandro confirmed that Officer Blue was wearing a vest and she realized he was a police officer. (*Id.* at 159-60.) Further, when Pauline Romero looked out the window a few minutes after the shooting, it was clear to her that the people outside pointing guns at the house were police officers because they were wearing vests and had on badges. (RT 10/10/02 at 121-22.) She saw Officer Blue within the hour after the shooting and she said it was clear he was a police officer based on the vest he was wearing. (*Id.* at 125.) A neighbor across the street, Diane Martinez, testified that immediately after the shooting she saw Officer Lewis exit his truck and it was clear to her based on his clothing that he was a police officer. (*Id.* at 10.) Gonzalez testified that he could not see any clothing on Officers Blue or Lewis that identified to him they were police officers. (*Id.* at 212-13.)

In sum, witnesses provided conflicting testimony about what Officer Blue announced and who could see and identify Officers Blue and Lewis based on their clothing. However, there was more than enough evidence from which the jury could reasonably conclude that Gonzalez knew they were police officers. As pointed out by Gonzalez, the fact that he knew there was a warrant out for his arrest is not by itself sufficient evidence to prove beyond a reasonable doubt that Gonzalez knew the men approaching him that day were police officers. However, it is an additional fact that, when looked at in the light most favorable to the prosecution, supports the verdicts.

Having reviewed the entirety of the transcripts, taking all evidence in favor of the prosecution, the Court finds a rational trier of fact could find that Gonzalez was guilty beyond a reasonable doubt of the crimes of which he was convicted. The court of appeals decision denying this claim was not an unreasonable application of *Jackson*.

**Claim 14 (Trial II)**

Gonzalez alleges he was denied due process and a fair trial by police destruction of exculpatory evidence. Specifically, Officer Blue moved his car prior to the investigation of the shooting. As discussed in the procedural default section above, Gonzalez fairly presented this claim in a supplemental PCR brief. The PCR court did not address it. Therefore, the Court reviews the claim *de novo. See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

In *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), the Court held that absent a showing of bad faith on the part of the police, "failure to preserve potentially useful evidence does not constitute a denial of due process of law." The duty to preserve evidence is limited to "evidence that might be expected to play a significant role in the suspect's defense," which requires that the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 488-89 (1984). The bad faith requirement of *Youngblood* hinges on whether the government had knowledge of the exculpatory value of the evidence before its destruction. *See United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993).

Gonzalez argues that Officer Blue was very experienced and, therefore, knew his car would be part of the investigation and moving it would amount to destruction of evidence. Petitioner explained that "[t]he location of Officer Blue at the time of the shooting became extremely important when it was the Defendant's and other witnesses' testimony that he was shooting from behind the open door of his vehicle, located in the middle of the road." There was conflicting testimony about whether Officer Blue remained behind his door or immediately stepped into full view as he exited his car. Petitioner fails to explain how the exact location of Officer Blue's car would have helped establish whether he was behind his door when he began shooting.

Although Petitioner does not discuss the significance of Officer Blue's location, presumably the issue was whether Gonzalez had a good view of Officer Blue prior to the

shooting, such that he should have known he was a police officer.  That point turns out not to be critical, as conceded by defense counsel in closing arguments.  She emphasized that even if Officer Blue was not behind his door, that Officer Blue himself stated that he fired his weapon from behind a tall truck, which would have obscured him being fully seen.  (RT 10/11/02 at 80.)   As counsel stated, the more critical factor was whether Officer Blue identified himself (*id.* at 69) and Gonzalez knew he was a police officer.  Similarly, Officer Blue testified that he announces himself because a person might not otherwise know he was a police officer.  (RT 10/9/02 at 99.)  The jury concluded beyond a reasonable doubt that Gonzalez knew or should have known that the victim, Officer Lewis, was a peace officer on official duty.  (*Id.* at 122-23.)  Thus, Officer Blue's location did not play a "significant role in the suspect's defense."  Further, the exact location of his car is a distinct, irrelevant, matter from Officer Blue's location in relation to the car when he exited his vehicle and when he shot his weapon.  Finally, Petitioner has not demonstrated bad faith because, regardless of Officer Blue's experience, he could not have known when he moved his car that there would later be a conflict in the testimony at trial, which could have been resolved if he had not moved his car.  Thus, the exact location of his car did not have apparent exculpatory value.

Petitioner has failed to establish that he was denied due process by Officer Blue moving his vehicle prior to investigation of the crime scene.

**Claim 15 (Trial II)**

Gonzalez alleges the prosecutor made improper arguments in closing including: (e) referencing Gonzalez's prior conviction, which was not yet final; (h) arguing that defense counsel did not know what Gonzalez was going to say on the stand and "concocted a story at the last second"; and (i) arguing that Officer Blue needed to move the police car after the shooting due to criminal activity in the area connected to Gonzalez.

Legal Standard

Clearly established federal law provides that the appropriate standard of federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and

not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). Therefore, in order to succeed on this claim, Gonzalez must prove not only that the prosecutor's remarks were improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*; *see Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

In determining if Gonzalez's due process rights were violated by the prosecutor's remarks during closing argument, a reviewing court "must consider the probable effect of the prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). To make such an assessment, it is necessary to place the prosecutor's remarks in context. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33-34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). In *Darden*, for example, the Court assessed the fairness of the petitioner's trial by considering, among other circumstances, whether the prosecutor's comments manipulated or misstated the evidence; whether the trial court gave a curative instruction; and the weight of the evidence against the accused. 477 U.S. at 181-82. During closing argument, "prosecutors are allowed reasonably wide latitude and are free to argue reasonable inferences from the evidence." *United States v. McChristian*, 47 F.3d 1499, 1507 (9th Cir. 1995); *see United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997). Moreover, the Supreme Court has clearly indicated that the state courts have substantial latitude when considering prosecutorial misconduct claims because "constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise." *Donnelly,* 416 U.S. at 645.

<u>Subclaim e</u>

2        Gonzalez argues that it was improper for the prosecutor to refer to his prior

3    conviction, which was not final because he had not been sentenced nor completed the

4    appellate process.  He contends it was not relevant to the case and was prejudicial because

5    it was used to show that he had a criminal propensity.  Further, he argues the prosecutor

6    improperly suggested that because he denied that he committed the prior offense, despite his

7    conviction, that he was lying at the trial of the subsequent crimes.

8        In her initial closing argument, the prosecutor stated:

9        I would submit to you, Ladies and Gentlemen, he is the unluckiest man in the
         world or he simply was lying when he took the witness stand.  Think about it.
10       He had a warrant out for his arrest for a shooting that he didn't commit two
         weeks, less than two weeks before this incident.  And he didn't commit it even
11       though a jury of 12 people said he did a week before this incident.

12    (RT 10/11/02 at 65.)  In her closing argument, the defense attorney noted that you can

13    consider a person's felony conviction in deciding whether that person is a credible witness,

14    but the fact that a person has been in trouble does not automatically make them a liar and

15    each person should be assessed individually based on all the circumstances.  (RT 10/11/02

16    at 73-74.)  She acknowledged that she was afraid the jury would convict Gonzales because

17    they might not like him because he's been in trouble, but that he deserved justice.  (*Id.* at 87.)

18    She also argued that Gonzalez's sense of justice had been violated because his prior

19    conviction was for something he told the jury he did not do.  (*Id.* at 92-93.)  Defense counsel

20    tried to describe to the jury how Gonzalez saw things at the time: he's in a bad neighborhood,

21    a black man not in a police uniform points a gun at him, and a second unmarked car

22    approaches rapidly and that person has a gun.  (*Id.* at 88, 91.)  She suggested the warrant was

23    irrelevant under those circumstances.  (*Id.* at 91.)

24        In rebuttal, the prosecutor responded to these arguments:

25       The only reason you can consider prior convictions are whether or not they
         affect his credibility.  That's what the law is.
26
27           People who break the law and get convicted sometimes maybe aren't
         the most honest and truthful people.  You can consider it as to whether he was
         credible.  Whether or not he lied on the witness stand.  But you also get to

28

consider it as to whether or not he was truthful on the witness stand when he was asked about whether he didn't shoot two weeks before, 'cause he's saying there is no reason to believe the police were coming. I wasn't involved in the shooting, so that goes to his credibility. He didn't do the shooting, either. 12 people, misjustice, injustice. 12 people wrongfully convicted me.

You also get to consider what happened two weeks before for no reason, the motive, not the conviction. But the thing that happened two weeks before for his motive to shoot the police. He had a warrant out for his arrest for a serious offense, which he was facing significant prison time. You get to consider it as to whether or not he had a motive to try and have a shootout with the police.

. . . .

[To find reasonable doubt,] [y]ou would have to believe, Ladies and Gentlemen, that this guy who just happens to be the saddest, unluckiest, sorriest person in the world was wrongfully convicted of another shooting incident.

(RT 10/11/02 at 105–06, 108.)

The court of appeals found that the prosecutor's arguments were within the bounds of the court's rulings on the use of this evidence because "each statement was either made to question the veracity of Gonzalez's testimony or to show that Gonzalez knew there was a warrant for his arrest." (Doc. 18, Ex. D at 17.)

First, there was nothing improper about the prosecutor referring to Gonzalez's prior conviction solely because it was not yet final on appeal. The conviction was admitted by the trial court and Gonzalez has cited no reason it was inadmissible. Next, the prosecutor never suggested or inferred that Gonzalez had a criminal propensity. She properly argued that the prior shooting provided grounds for Gonzalez to know there was a warrant out for his arrest and gave him a motive to shoot at the police when they executed the warrant. She did not argue or imply that because he committed one shooting the jury should find him guilty of a subsequent shooting. Finally, the fact of his conviction was relevant and a reasonable basis on which to challenge his credibility. It was well within the bounds for the prosecutor to challenge Gonzalez's testimony with the fact of a prior conviction. The arguments by the prosecutor were not improper and did not render Gonzalez's trial fundamentally unfair.

- 43 -

Subclaim h

Gonzalez contends that it was improper for the prosecutor to argue that defense counsel did not know what Gonzalez would say if he testified and that he created his story at the last minute, which she used to imply that Gonzalez was a liar.

In her closing argument, defense counsel argued that if the prosecutor thought Gonzalez was being dishonest in his testimony, she should have brought in witnesses to rebut it and demonstrate he was lying. (RT 10/11/02 at 72-73.) In her rebuttal argument, the prosecutor responded to defense counsel's assertion that she could have brought in rebuttal witnesses:

> Well, guess what, Ladies and Gentlemen? Just like you don't know what he is going to say, this guy here is going to say until the second he gets on this witness stand, I don't know that in advance. I have no idea what story is going to be concocted. You know what? She didn't know, either. How do we know she didn't know –

Ms. Thorpe: Objection

The Court: Sustained.

(RT 10/11/02 at 101.) The prosecutor went on to state that the case had evolved since the defense's opening argument in response to Gonzalez's testimony.[7] (*Id.* at 101-02.)

The court of appeals found that these statements were fair rebuttal to the closing argument of Gonzalez's counsel. (Doc. 18, Ex. D at 16.) The Court agrees. The prosecutor's remarks were a "fair response" to defense counsel's arguments that the government should have called rebuttal witnesses to impeach Gonzalez's testimony. *McChristian*, 47 F.3d at 1506. Contrary to Gonzalez's argument, the prosecutor did not

---

[7] In his petition and reply brief, Gonzalez also appears to be suggesting that the prosecutor's argument implied that defense counsel, not just the defendant, "concocted" a story. (Doc. 1 at 73; Doc. 21 at 68.) As is evident from the quote above, the prosecutor made no such argument. Gonzalez goes on in his reply brief to argue that the prosecutor further disparaged defense counsel by suggesting she tricked the jury. (Doc. 21 at 70.) This is an erroneous reading of the record. When the prosecutor referred to "a trick a lawyer does" to reveal that a person's story is made up (RT 10/11/02 at 66) she was talking about her own cross-examination of Gonzalez (*see* RT 10/10/02 at 245-51).

insinuate that Gonzalez and/or his counsel altered his testimony to conform to other trial evidence. She argued only that his testimony was unknown until presented. Further, this was one brief remark in her closing argument, to which the objection was sustained, and did not render Gonzalez's trial fundamentally unfair in violation of due process. *See id*. (finding comment was a minor portion of rebuttal and did not amount to a miscarriage of justice).

Subclaim i

Gonzalez argues that the prosecutor improperly suggested that Officer Blue needed to move his police car after the shooting because the police had to take some action in relation to the house Gonzalez was heading towards at the time of the shooting. The trial court had precluded admission of evidence regarding why the police raided the house, and Gonzalez argues the prosecutor improperly suggested Petitioner was tied to criminal activity at that house.

In her rebuttal argument, the prosecutor discussed the location of Officer Blue's car (RT 10/11/02 at 102-03), a dispute that defense counsel addressed in her closing argument (*id*. at 79). The prosecutor stated: "You heard the testimony. They wanted to give him a, before he went in there, they wanted – why they needed to do that is immaterial. They needed to take him down before he went into that house." (*Id*. at 103.) The court of appeals found that this statement was fair rebuttal to the closing argument of Gonzalez's counsel. (Doc. 18, Ex. D at 16.)

The Supreme Court has directed that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *DeChristoforo*, 416 U.S. at 647. When looking at the challenged statement, standing alone or in context, it has very little meaning. It does not unambiguously imply that Gonzalez was involved in criminal activity being conducted in that house. The jury could easily have inferred that taking a person down in the open rather than inside a home was standard police procedure. In fact, there was testimony, to which there was no objection, that

the officers were instructed to take Gonzalez down outside. (RT 10/9/02 at 54, 121-22, 186, 198.) The prosecutor made the statement in the context of discussing where Officer Blue, his car, and the other officers were located at the time of the shooting, during which she acknowledged that Officer Blue's car was moved prior to the scene being photographed. (RT 10/11/02 at 102-03.) Officer Blue testified without objection that he moved his car because the house at 138 Calle Evelina was going to be cleared after the shooting. (RT 10/9/02 at 77). Those limited references did not prejudice Gonzalez by implying he was involved in criminal activity at the house. In sum, nothing in the brief argument was improper or rendered Gonzalez's trial fundamentally unfair.

Conclusion

A prosecutor "may prosecute with earnestness and vigor - indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). Here, the prosecutor struck hard blows to Gonzalez's defense, but none were foul blows. Therefore, the Arizona Court of Appeals' denial of these subclaims was not an unreasonable application of Supreme Court law.

**Claim 17 (Sentences)**

Gonzalez alleges that his sentences violated his constitutional rights because (A) the judge failed to exercise discretion and imposed the sentences based on an inflexible mechanical process; and (B)(1) the aggravating factors were not determined by a jury in violation of *Apprendi* and *Blakeley*.

Subclaim A

Gonzalez alleges that the trial court imposed his sentences based on an "inflexible mechanistic manner," which was an abuse of discretion. Petitioner does not assert that this violated a federal constitutional right, therefore, this claim is not cognizable in this proceeding. *See* 28 U.S.C. § 2254(a) (defining the writ of habeas corpus as available for someone in state custody only if they are held in violation of the Constitution). Although Petitioner cites cases from federal circuits, all of them are direct review cases finding an

1 abuse of discretion not a constitutional violation in how a trial court reached its sentencing

2 decision. *See United States v. Barker*, 771 F.2d 1362 (9th Cir. 1985); *United States v.*

3 *Brown*, 723 F.2d 826 (11th Cir. 1984); *United States v. Wardlaw*, 576 F.2d 932 (1st Cir.

4 1978); *United States v. Hartford*, 489 F.2d 652 (5th Cir. 1974); *Woosley v. United States*, 478

5 F.2d 139 (8th Cir. 1973); *United States v. Daniels*, 446 F.2d 967 (6th Cir. 1971). As the First

6 Circuit Court of Appeals pointed out in *Wardlaw*, the Eighth Amendment is implicated with

7 respect to a claim that a sentence is extremely disproportionate to the offense, however, that

8 is distinct from a claim that a sentencing court failed to exercise its discretion necessary to

9 imposing individualized punishment. 576 F.2d at 937-38. The requirement of individualized

10 sentencing is not constitutional but legislative and "firmly entrenched in our present

11 jurisprudence." *Barker*, 771 F.2d at 1365, 1367-69; *see also Williams v. People of State of*

12 *New York*, 337 U.S. 241 (1949). Because Subclaim A does not raise a federal constitutional

13 question it is not cognizable.[8]

14     Subclaim B(1)

15     Gonzalez argues that his sentence violated his rights under the Sixth and Fourteenth

16 Amendments because he was denied a jury determination of the aggravating factors used to

17 enhance his sentence.

18     At trial, Gonzalez admitted he had a felony conviction from May 1999. (RT 10/10/02

19 at 259.) At sentencing, the judge found multiple aggravating factors: prior conviction,

20 lengthy criminal history, failure to take advantage of prior opportunities for rehabilitation,

21 and, as to the endangerment counts, the victims' ages. (RT 11/20/02 at 64.) The judge found

22 _____

23     [8] When raising this claim on direct appeal, Petitioner cited the same grounds which did
not include a federal constitutional violation. Thus, this claim was not exhausted. Because

24 Respondents did not raise this argument, however, the Court dismisses it as non-cognizable
rather than as defaulted. *See* 28 U.S.C. § 2254(b)(2). Petitioner likely fails to articulate a

25 constitutional right underlying this claim because there is no clearly established Supreme
Court law establishing a right to a non-mechanistic sentence. Thus, habeas relief could not

26 be granted on this claim even if Gonzalez had stated the claim as one arising under the

27 Constitution. *Williams*, 529 U.S. at 381; *Musladin*, 549 U.S. at 70, 77.

28

that, although there was one mitigating circumstance, it was not sufficiently substantial to warrant a lesser term. (*Id.*) The judge imposed an aggravated sentence as to all nine counts, including consecutive eighteen-year terms for the two attempted murder convictions. (*Id.* at 64-66.) Gonzalez raised this claim in his PCR petition and the court denied it, finding that "Defendant's admission of a prior conviction during his testimony was sufficient to support the aggravated sentence. *See State v. Martinez*, 210 Ariz. 578, 115 P.3d 618 (2005)." (Doc. 18, Ex. J at 3.)

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely v. Washington*, 542 U.S. 296, 301 (2004) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). "The 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Id.* at 303 (citations omitted). In assessing how *Blakely* applied to the Arizona sentencing scheme, the state supreme court held:

> Under A.R.S. § 13-702, the existence of a single aggravating factor exposes a defendant to an aggravated sentence. Therefore, once a jury finds or a defendant admits a single aggravating factor, the Sixth Amendment permits the sentencing judge to find and consider additional factors relevant to the imposition of a sentence up to the maximum prescribed in that statute.

*State v. Martinez*, 210 Ariz. 578, 585, 115 P.3d 618, 625 (2005). It was this analysis upon which the PCR court relied in rejecting Gonzalez's claim.

Based on the jury verdicts and the prior felony conviction that Gonzalez admitted, he was eligible under Arizona law for an aggravated sentence of up to twenty-one years on the two attempted murder convictions. In its discretion, considering several aggravating factors in addition to the prior conviction, the court imposed consecutive eighteen-year sentences. Gonzalez concedes that the felony to which he admitted "could technically suffice for an aggravated sentence." (Doc. 1 at 88.) He argues, however, that using that Class VI felony as the basis for aggravation was unreasonable and an abuse of discretion. That is not a

constitutional claim.

The only question is whether the state's rejection of Petitioner's *Blakely* challenge was contrary to, or an unreasonable application of, clearly established Supreme Court law. The answer is no because the Supreme Court has never held that the Sixth Amendment prohibits the imposition of an enhanced sentence where at least one *Blakely*-exempt aggravating factor increases the maximum applicable sentence. Once the new maximum was established, the court was free to consider the other aggravating circumstances in deciding where to sentence Petitioner within the new maximum range. *See United States v. Booker*, 543 U.S. 220, 233 (2005) ("For when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."). Judges of this Court have consistently held that once a single aggravating factor is admitted or found by a jury in Arizona, or the defendant has a prior conviction, that alone is sufficient to increase the range within which a judge may impose a sentence. *See Van Norman v. Schriro*, 616 F. Supp. 2d 939, 954-55 (D. Ariz. 2007) (citing *Jones v. Schriro*, No. CV 05-3720-PHX-JAT, 2006 WL 1794765, *2 (D. Ariz. June 27, 2006); *Garcia v. Schriro*, No. 06-0855-PHX-DGC (DKD), 2006 WL 3292473, *2-3 (D. Ariz. Nov. 9, 2006); *Nino v. Flannigan*, No. 2:04-cv-02298-JWS, 2007 WL 1412493, *4 (D. Ariz. May 14, 2007)).

Based on the above, the state court's denial of this claim was not an unreasonable application of *Blakely*.

## CONCLUSION

Claims 2, 3, 6 (as to Escusa and Canez), 7, 8, 9, 11, 13, 15 (a) to (d), (f) and (g), 16(A) (1), (2), (3), (5), (6) and (7)(b), 16(B), 17(B)(2), and 17(C) are procedurally defaulted and should be dismissed on that basis. Claims 1, 4, 5, 6 (as to Duran), 10, 12, 14, 15(e), (h) and (i), 16(A) (4), (7)(a) and (8), 17(A), and 17(B)(1) do not warrant relief under the AEDPA and should be dismissed on the merits. Petitioner's request for discovery and an evidentiary hearing as to Claims 4 and 16(A)(7)(a) should be denied. To the extent Gonzalez seeks an

evidentiary hearing as to any other claims it is not warranted because he failed to articulate a material factual dispute or that he would be entitled to relief if he fully developed the facts alleged. *See Townsend*, 372 U.S. at 312-13.

## **RECOMMENDATION**

Based on the foregoing, the Magistrate Judge recommends the District Court enter an order DISMISSING the Petition for Writ of Habeas Corpus.

Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CV-08-658-TUC-FRZ**.

DATED this 27th day of August, 2010.


_____
D. Thomas Ferraro
United States Magistrate Judge